If it please the Court, this appeal of a ducking case arises from a set of facts. Let's say I'm a German producer selling pens in the U.S. I sell a red pen, I sell a blue pen. The red pen is wildly popular. People like the color. It writes smoothly. The blue pen, not so popular. It doesn't write so smoothly. People are annoyed by the blue. So, because of popularity of the pen, I can get a higher price for it in the U.S. market. The blue pen, there's lots of competition in the U.S. market. I can't get a very good price for it. So, Commerce Department conducts a dumping investigation, and they find that the red pen is not dumped. But the blue pen is dumped. But they're both pens. Why didn't Kohler challenge the breadth of the subject matter classification to get the 48 gram treated as a separate class of goods? Treat the red pen separate from the blue pen. Because Kohler didn't believe that they could meet the standard for a separate class of common. A separate class of common requires a difference in the general physical characteristics. Expectations of the ultimate users. The ultimate use of the products have to be different. The channels of trade of the product. Why couldn't you have argued what you just argued? That the class ought to be defined by the market, and the markets for those two pens were vastly different. Or the classes of, in this case, the lightweight thermal papers. Because the general physical characteristics are the same. They're still pens, in other words. Isn't that what you are effectively arguing should have been taken into account in the ITC's consideration? Aren't you asking for that precise determination that would have been appropriate before commerce to be made during the injury proceeding? But, Your Honor, the Commerce Department did distinguish the 48 versus the 55 in their proceeding. It didn't make a dumping holding with respect to the 48 gram product, did it? They considered it a separate model. But they did not make a dumping holding based on that model. They calculated a separate dumping margin for that model. That's in the printout. But the only dumping ruling they made was with respect to the overall product class. The ruling, Your Honor, that they made, it consists of not only the summary weighted average dumping margin in the Federal Register Notice, but everything underlying it. That would include the unpublished decision memorandum. And it would also include the computer printout, as this Court has said in their consignature. True. But what I'm getting at is that the dumping margin was issued for the overall class of goods, not with respect to any individual weight of paper. Correct? The overall dumping margin was with respect to the paper in general. So there was no separate ruling made issuing a separate dumping margin with respect to 48 gram paper versus any other kind of paper. But it's clear from looking at the ruling itself, looking at the computer printout, that's part and parcel of the ruling, that there is a negative number for one of the models, and that was the only model that was 48 gram. But that's part of their overall consideration of the class of goods. And they analyzed all of these factors. They considered all of the data, and they came up with a dumping ruling. And as I understand it, you didn't object to that. You didn't say, well, wait a second, the underlying data supports, you know, separate treatment here, and let's not wrap this all up into one category. Because we didn't do that because we could not meet the high standard for a separate class or kind. But there was enough differences in the products that they categorized them into different models. And the IPC found, in fact, that there was enough differences in the product that they found that one was causing a lot of injury, the other one was not. And it's that unique combination of facts. Does the printout show a dumping margin separate for the 48 and 55 gram paper product? Yes, it shows a negative dumping margin for the 48 gram. What does it show for the 55 gram? It shows a variety of dumping margins depending upon various other characteristics. It's approximately 13%. It's about, let's see, it is negative 4.11%. This is at page 1151 of the joint appendix, the last number all the way in the lower right-hand corner. There's a negative number here. And, again, I've got to be careful because this is our own client's confidential information. Okay, but I want to know what was the percentage. So the negative number, that's for 48 gram. Right. And without revealing the actual numbers, are you saying the other four dumping margins listed above are for the 55 gram? The other ones are all for products other than the 48. I think one of the models happened to be either 55 or 48, but it was very small. Okay, but I guess here's my problem. My problem is that Commerce only issued a margin, 6.5%, for the overall class. And we all agree that's a weighted average that took into account the individual margins for the 55 gram and the 48 gram. And so you can't have it both ways. If you're getting a much lower margin because they factored in the negative dumping margin for the 48 gram paper. So you're getting the 6.5% number is much lower than what the number would be if it were only examining 555 gram paper. So you can't get the 6.5% number as applied to both later on. You would have had to, it seems, appeal it right then and there that a single joint treatment of the two isn't appropriate. You should at least issue two separate dumping margins for each of the separate goods. But we're not arguing that they should have two separate dumping margins. No, because you want to get the 6.5% number for the 55 gram paper. So you don't want to argue two separate margins because the margin that would actually apply to the 55 gram paper is much, much higher. All the margins on 1151 other than the one you pointed me to for 48 gram are more than double what Congress chose in this case. And some of them multiple, multiple times. No, actually, Your Honor, if the facts had supported a separate class of time, we would have loved to have been able to argue that. Because then there would have been a zero dumping margin for the 48 gram. That would immediately, that wouldn't even, that would drop out. That wouldn't even go to the ITC. And then that would leave the 55, which the ITC said really isn't bothering the U.S. industry. And then there would be no dumping order whatsoever. We would have loved to have done that. We couldn't do that because we couldn't meet the test for a separate class of time. It's because it's, with any product, there are going to be little tiny differences. Unless it's like, you know, bags of salt. Maybe even there there's differences. You know, this is not bags of salt. There are, there are some differences between products that don't quite amount to a separate class of time. Mr. Farron, if I understand you correctly, the bulk of your cells are in the 48 gram category, right? So the harm is based on the volume sold of 48, but the dumping margin is based on the 55? Is that your point? At the beginning of the period, during most of the period, most of our sales were in the 55. And the 48 increased significantly towards the end of the period. And this is all in the ITC opinion. The ITC opinion said that, you know, although there was significant competition in the area, we gave the most weight in terms of the pricing analysis to the 55 gram product. The product won because that was something where they both were competing very heavily. And it was the biggest part of both parties. But what they noted for purposes of the threat of material injury determination is, what is the trend going in the future? And the trend going in the future was just the opposite. Kohler, as it's indicated... The 48 is becoming more popular in the market. Right. Well, doesn't that mean that this will only last one shot then and you'll be out of this dumping soon? Well, unfortunately, the way the dumping... We hope to get all of our deposits back, Your Honor, about approximately a year from now when the final results of the first administrative review are completed. The first administrative review is underway right now. And if we get a zero margin, which we are fully expecting because we're selling only 48, and, in fact, it's not dumped, then we'll get all of our money back. The dumping order, however, will still be in effect until we go through this procedure three years in a row showing that we have a zero or de minimis margin. And then we can ask the Commerce Department to revoke the dumping order. And there's various criteria that they would use to say either yes or no on the replication of the dumping order. We don't want to go through all of that. We see no point in going through all of that because you've got injury, you've got dumping, and never the twain shall meet. I'd like to save the rest of our time for the public. You may. Thank you. Mr. Bernstein? May I please declare? The principal issue in this case is one of statutory construction. Address his point that he just made, that this is a pretty blunt tool that you're using. And if you used a little more careful economic analysis, we wouldn't have to go through all this. Well, let's see what the statute says. Address his point on this specific case, please. The specific case is that we, first of all, we are required to make an affirmative, a dumping, an injury determination based on the affirmative, the subject merchandise for which Congress has made an affirmative determination. That's called lightweight thermal paper. Second point is the statute is very direct that when the commission uses a dumping margin, it has to use a dumping margin that is published by Congress. Now, again, you're not addressing his point, which is that in this case, if you used a more sophisticated economic analysis, you wouldn't put us all through this because the market has moved to 48, 48 isn't dumped. No. First of all, Congress never made the finding that 48 gram paper was dumped, was not dumped. The only finding that Congress made was the one published in the Federal Reserve. Let's go to 151, but you can look at a variety of other sources as well to see that there's no dumping margin or there's a negative dumping margin on the 48. These are your figures. Your Honor, that's not a dumping margin. That's an intermediate calculation. We can play with the semantics here. The question is the way you're applying your broad discretion. You have a lot of broad discretion, and if you used it with a little more economic sophistication, we wouldn't have to do this. Your Honor, I would subscribe we don't have a lot of discretion, not when the legislative history says that the ITC is not supposed to go behind the commerce dumping margin. What we have here is not findings by the Department of Commerce. What we have, the page of the joint appendix that Mr. Farron cited, is a row of numbers and a row of explanations. It's a proprietary document. There is nothing on the document indicating what these figures signify. You're not telling me that you can't read these documents. I can read them. There's no dumping margin on 48. The only thing that's clear is that they made a little annotation that there was a negative figure. Is there any evidence in the record to support the notion that 48-gram paper was dumped, and if so, show us where it is. That's a good question. I like that one. The answer, Your Honor, is that you're asking the commission to make an analysis the legislative history specifically doesn't want the commission to make. This was a 3-3 vote, wasn't it, at the commission? Yes, it was. So there's at least three commissioners that are using pretty reasonable economic standards. The three commissioners, excuse me, Your Honor. When Curler first made this argument, they were making it not with respect to the threat of injury argument. They were making it with respect to the entry argument. They were arguing. They were not arguing for sophisticated economic analysis, Your Honor. They were arguing that the entire volume of 48-gram should have been excluded from the volume. Go back to Judge Moore's question and show us anywhere in the record that supports the idea that 48-gram paper was dumped. That would be, Your Honor, we subscribe that as a matter for the Department of Commerce. Are you saying you can't do it? We are not supposed to do it. That is what the legislative history indicates. We are not supposed to do this. We do not have expertise in calculating dumping. There are certain prerequisites that must be found before you find a dumping margin, as opposed to making calculations. I believe Mr. Dorn will get into that a little further. But it is clear this is not the areas of commissions expertise the commission is not supposed to go, that the commission certainly can reasonably decline to go through these documents. But the commission is not foreclosed from reviewing those documents, correct? It is certainly not clear under what circumstances the commission could review such documents. If the statute indicates that the commission must consider all subject merchandise in a determination and the commission is only supposed to use the published dumping margin and is not supposed to go through and go drill beneath the margin. Our Algoma Steel case, as I read it, says there is no per se rule one way or the other as to whether you can or cannot look behind to computer printouts or anything else that is in the record. We know all of this is in the record. So it is in the record that the ITC has before it of the proceedings conducted by Commerce. So the question then becomes whether somehow, in your view, the ITC is foreclosed from looking at these computer printouts and is obligated to close its eyes and simply say there was a dumping margin of 6.5 on the class and kind of merchandise. That is all we are going to look at. The current six commissioners on the basis of footnote 201 of the commission opinion took precisely that view. Certainly, while Algoma has dictum indicating it is not going to indicate a per se rule, the holding of the case was that the statutory language was clear and unambiguous that once Commerce found a class or kind of merchandise to be sold at less than fair value, the terms of individual sales did not matter. And since that time, we have had these additional amendments to the statute that governs what the commission is supposed to look at when it looks at the dumping margin, which is the dumping margin that Commerce published in its determination in the Federal Register. Certainly, in light of those, it is certainly reasonable under the Chevron standard for the commission to decline to look at any of these printout types of materials. What does the commission look at in making its indirect determination? What the commission looks at as far as the dumping margin is what Commerce publishes in the Federal Register for the class or kind that has made an affirmative determination. So it is just rubber stamps with the Commerce Department? Well, it is supposed to rubber stamp on dumping. That is correct. I mean, it is not supposed to make an independent examination. No, but it is supposed to make a separate determination of injury, which is not within Commerce's bailiwick. So the dumping decision by Commerce has nothing to do with injury. And the question then becomes, why can't the commission, and in fact, is it wrong for the commission in making its dumping determination, its injury determination, is it wrong for the commission to ignore the underlying data that indicates that with respect to the 48-gram paper, there does not seem to be any dumping? Actually, it is important to remember the commission does not define the scope of the imported merchandise. That is something the Commerce Department does that the commission cannot modify. I recognize that. But it has to take a look at all of the facts and evidence before it in making its injury determination. It certainly takes into account all the facts concerning the condition of the domestic industry, what the subject producers are doing. The one thing where Congress has specifically limited the discretion of the commission is with respect to what it uses as dumping margins. Again, there is a specific thing, use what Commerce has published. But I don't think that is the argument that is being presented here. The argument is not that, well, they got the dumping margin wrong. The argument is that the injury determination was predicated upon conduct that is not based on the evidence in the record, not sold with regard to that subclass of goods not sold at less than fair market value. The injury determination was based on all the subject imports. The commission included all the subject imports in the bottom calculation. But its focus was on the 48-gram paper. Because Perler had discontinued exports of the 55-gram paper three months before the commission's period of investigation ended. But it does seem to me, and I don't think you're going to disagree with me, it seems highly artificial to conclude that there is a threat of injury with respect to 48-gram paper because that was the focus when, in fact, there is evidence in the record to suggest that 48-gram paper is not being sold at less than fair market value. Well, if that was the case, as the initial question to Mr. Farron went, they should have gotten a ruling from Commerce. The ruling from Commerce was that all subject merchandise was sold at less than fair value to 6.5% weighted average dumping margin. Counsel, one question before your time is, well, I guess it's already expired. Okay. He's taking now the time from Mr. Dorn. Go ahead. Well, one quick question, which is, so this is a really neat and easy case. It's got a very compelling set of facts. Injury for this one, dumping for this one. None of them have both injury and dumping. You're going to dispute it, but say I don't. Say I think that's what the record clearly shows. So he's got a really compelling set of facts. I guess what I was hoping to hear you say is if we decide that way in this case, the problem becomes there might always be one tiny subset in a class of goods for which there is a negative margin, but we can't always parse that out, and it's not something neat or easy to be done. That is absolutely correct, Your Honor, and if I should have said that and didn't, I regret not saying so, but that's absolutely correct. But, of course, if you used a little economic sophistication, you could figure that out, couldn't you, pretty quickly and easily? Well, again, I think the economic parts of this argument were appealed to the court below. They were not appealed here. Okay. Thank you, Mr. Bernstein. Mr. Dorn has three minutes left. May it please the Court, to begin with, it is not possible to have a dumping margin for a subset of a class or kind of merchandise defined by commerce. It's just not possible under the statutory scheme, and Curler never asked for it to be a separate dumping margin calculation. We're just asking for you and the industry and for the regulators here to do a sophisticated economic analysis, see what is the product that's really being sold in the marketplace, and then look at the figures and see that it's actually not being dumped. But first you have to do a sophisticated dumping analysis based on the statutory criteria, which includes finding that the home market sales meet the viability test. If this dumping margin is retracted because, as Mr. Farron seems to think will happen, would it be appropriate for the ITC to reverse the fees and impose some cost on the petitioner? No, Your Honor, not at all. Why not? They would have then occasioned a great expense for one of their competitors that was not justified. Your Honor, the statute makes clear that in order to determine dumping, you have to determine that the home market is viable. If you look at page 13 of our response brief, the information is confidential. But the question is whether 48, looked at alone, would constitute a viable home market. The Commerce Department never did that because Curler didn't ask them to do it. If you look at page 1152. We went through that with Mr. Farron. The reason they couldn't ask that is because it is a pen. It is lightweight thermal paper. In other words, there was a little unsophisticated analysis put into the initial classification. And now they do fit the classification, but the little market sophistication in analyzing the goods would show there's no dumping margin for the bulk of the material. It would be entirely unsophisticated and contrary to statutory history to base a dumping margin on a very thin level of sales in the home market. And that's why you have the 5% test. At page 1152 in the calculations, Commerce set forth the final determination, any dumping duty margins, there's only one margin there. That margin was subjected to the home market viability test. Commerce knew there was a viable home market to give valid data to calculate a dumping margin with respect to the entire class or kind. Even if we accept that premise that there's no basis to make a dumping conclusion on anything other than the goods of the same class and kind. So it would be improper, would have been improper to separate it out. We're looking at the injury determination made by the ITC. And the ITC obviously looked at a whole bunch of things, including the fact that the 48-gram paper was what was driving the future issue. And they found that that was the area where there would be future competition. Why would Commerce then blind itself, close its eyes to the fact that there is this underlying data, maybe it's not a dumping determination, but it's underlying factual information that if taken into account would have led to a determination of no injury or no threat of injury. Under the statutory plain language of the legislative history, in 30 years of consistent practice, the Commission did what it was required to do. The causal link is between the threat of injury and imports of the class or kind of merchandise. That's what the statute says, that's what the legislative history says. It's the subject merchandise. It's the subject merchandise. I think we have it. Mr. Dorn, anything else? Well, I think that is what the brief says. We've got the brief. Thank you. Thank you, Your Honor. Mr. Farron, you have a little over four minutes. Yes, Mr. Farron, my concern is the one I expressed to the government attorney at the end. You've got a really compelling set of facts. I want to decide in your favor. You've made an excellent presentation. But my concern is that if we do that, aren't we then opening the door to say  And for one of them, something on a printout shows a negative margin. We're now saying the ITC has to do a separate behind-the-scenes analysis with regard to every single one of them. That, to me, seems like bad precedent for me to be making. And that's what my concern is, not your set of facts, but what the implication of a holding in favor view would have for the system as a whole. And so I guess that's, if you don't mind addressing that, that would help me. Yes, Your Honor. I think the answer is that it needs to be approached from when the ITC does its analysis. The ITC does take what the Commerce Department gave them, everything that they gave them. And the ITC tries to determine what's going on in this marketplace. What is causing the injury? Sometimes, most of the time, it's just talking about the product in general. They may have individual pricing comparisons just to make sure that it's apples to apples. But usually, in most cases, the entire determination doesn't turn on two hugely different trends on two different products. Now, if the ITC, on its own, says there's a hugely different trend on this one product and five other products there's not that trend on, then it's fair game for the other side to say, wait a minute. That one product that there's a totally benign trend on, that wasn't dubbed. And if there's evidence from the Commerce Department supporting that, let it in. Now, it's not always that neat. This case is really unusual because it's the first time I've ever seen anything like this. But you start off with the standpoint of what the ITC is determining. This is not going to lead to a situation where the ITC is going to be required to do a separate model-by-model injury analysis on every single model. Well, not just injury analysis, but dumping margin analysis, too, because whether you like it or not, Commerce held 6.5 percent was the weighted average for the entire class of LTWP paper. It didn't say for 55 gram. It said it made a holding. There was dumping across the entire class and came up with a weighted average. And so aren't I going to have to ask the ITC to go behind that, go behind Commerce in every instance? This would have been a much easier case, I guess, if there was some way you could have argued subclass or something about the commerce determination. As you said, Your Honor, we would have loved to have done that for the reasons I explained earlier. But first of all, the ITC can't tell Commerce, oh, go recalculate the margins because we find this one product interesting and you didn't separate it out in your dumping analysis. They do take that as a given. But you're asking me to find, to agree with you that there is no record evidence to support the idea that 48-gram paper was dumped. And my problem with that is that's not what Commerce held. And you just told me that's not what the ITC is supposed to do either. So why shouldn't you have had to repeal that fact-finding, no matter how blatantly wrong it is, and we might all be able to see it, why shouldn't you have had to repeal that fact-finding directly from Commerce? It's not a matter of repealing the fact-finding. It's a matter of going beneath the surface to find out that there's more subtlety there. Well, but you're challenging Commerce's finding that 6.5 percent, that all LTWP paper was dumped, and that 6.5 percent is the appropriate margin to apply to all of it. Commerce found it. It found dumping for the class. And so what you're saying to me, for me to buy into your argument, I have to start from the proposition that 48-gram paper was not dumped. And that's a fact-finding. That's what I'm struggling with. Well, again, this is something the ITC can look at this. The ITC can always ask for more information from the Commerce Department. In fact, the statute says— Mr. Farron, final thoughts? Any final thoughts? No, Your Honor. I need to hold you to time as I did your opposing counsel.